Filed 5/8/13  P. v. Fava CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>TROY DANTE FAVA,<br><br>　　　　Defendant and Appellant. | E055407<br><br>(Super.Ct.No. FV1800549)<br><br>O P I N I O N |

APPEAL from the Superior Court of San Bernardino County.  Jules E. Fleuret, Judge.  Affirmed.

Eric Weaver, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and James D. Dutton and Sabrina Y. Lane-Erwin, Deputy Attorneys General, for the Plaintiff and Respondent.

## I. INTRODUCTION

A jury found defendant Troy Dante Fava guilty of the murder of Adam Atencio (Pen. Code, § 187, subd. (a)),[1] grand theft (§ 487, subd. (a)), and burglary (§ 459). The jury also found that defendant was armed with a firearm in each count. (§ 12022, subd. (a)(1).) In a bifurcated trial, the court found that defendant had two prison priors. (§ 667.5, subd. (b).) Defendant was sentenced to 35 years to life, and appeals.

At trial, the evidence showed that Adam Atencio was shot and killed on March 7, 2008, at the apartment of Lucas Buckingham in Hesperia, after defendant and several of his cohorts burglarized the apartment and beat up Buckingham. Buckingham's Glock handgun was stolen from the apartment. It was unclear whether defendant or one of his cohorts shot and killed Atencio with a second handgun, a Sig Sauer.[2]

Shortly after the shooting, San Bernardino County Sheriff's Deputy Frank Hardin and other deputies entered defendant's home with guns drawn. After searching defendant for weapons, Deputy Hardin told defendant he was a suspect in a shooting that had just occurred nearby, and asked defendant to step outside so that a witness could identify him or rule him out as being involved in the shooting. In response, defendant said he had not

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] This court has previously affirmed judgments convicting defendant's cohorts, Christopher Shane Rivera and Peter Michael Lewis of first degree felony murder, robbery, and burglary in connection with the March 7, 2008, shooting of Atencio. (*People v. Rivera* (Apr. 18, 2012, E052339) [nonpub. opn.]; *People v. Lewis* (Mar. 22, 2011, E050174) [nonpub. opn.].)

left his house all day and could not have been present at the shooting. Defendant was not read his *Miranda*[3] rights before he made the statement.

On this appeal, defendant claims only that his un*Mirandized* statement that he was home at the time of the shooting was admitted in violation of his *Miranda* rights and Fifth Amendment right against self-incrimination. He claims he was in custody when he made the statement, and Deputy Hardin's statement to him that he was a suspect was reasonably likely to elicit an incriminating response.

We conclude that defendant's exculpatory statement was properly admitted. Even if defendant was in custody when he made the statement, he was not being interrogated. Under the circumstances, the deputy's statement to defendant that he was a suspect in the shooting was not reasonably likely to illicit an incriminating response. Instead, defendant reasonably should have understood that the statement was to inform him why the officers were there and why they wanted him to step outside. We therefore affirm the judgment.

## II. FACTUAL BACKGROUND

Buckingham had two encounters with defendant before the shooting of Atencio at Buckingham's apartment on March 7, 2008. We describe the prior encounters before describing what occurred at the time of the shooting.

A. *Events Preceding the March 7, 2008, Shooting*

Buckingham testified that he first met defendant at a friend's house several months before the shooting, when Buckingham was a marijuana and cocaine dealer. One

---

[3] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

3

morning in February 2008, defendant showed up at Buckingham's apartment and woke Buckingham up by pounding on the door. Buckingham answered, and defendant asked whether he was Buckingham. Buckingham responded by asking, "What's it to you?"

Defendant and Peter Lewis then forced their way into the apartment. Once inside, defendant proceeded to kick, punch, and beat Buckingham. While defendant was beating up Buckingham, Lewis picked up Buckingham's shotgun. Lewis pointed the gun at Buckingham, but defendant told him to stop.

Knowing he was a dealer, defendant and Lewis asked Buckingham where he kept his stash, cell phones, money, and guns. Buckingham denied having anything. After rummaging around the apartment, defendant and Lewis found Buckingham's marijuana. Defendant then beat Buckingham more severely for lying to him. After the beating, Buckingham's shirt was soaked in blood.

Defendant and Lewis left the apartment with two baggies of marijuana, the shotgun, a video camera, and some cell phones. Before leaving, defendant told Buckingham that if he called the police, every skinhead in Southern California would be at Buckingham's door to rape him. Buckingham believed that defendant attacked him because of a disagreement Buckingham had with defendant's girlfriend's mother.

Buckingham did not report the attack, but reported to police that his shotgun was taken in a burglary while he was not home. He testified that he reported the gun was stolen because it was registered in his name and he was worried what defendant and Lewis would do with the gun. Officer Arnold Mathias took the report on February 25,

4

2008. Along with the missing shotgun, Buckingham reported that a diamond ring and $170 in cash were taken. After his shotgun was taken, Buckingham illegally obtained a .40-caliber Glock handgun.

Buckingham further testified that some time after the February 2008 incident but before the March 7, 2008, shooting, he was sitting in his car in his apartment complex when an SUV pulled up behind him and blocked him in. Defendant got out of the SUV, walked up to Buckingham's car, knocked on the window in a hostile fashion, and told Buckingham they needed to talk. Buckingham opened his window slightly, pointed his Glock at defendant, and defendant backed away. Buckingham then backed his car into the SUV, forced his way out of his parking space, and quickly drove off. According to Buckingham, defendant got back into the SUV and the SUV tried to follow Buckingham, but the SUV lost sight of Buckingham after four or five minutes.

B. *The March 7, 2008, Shooting*

On the night of March 6, 2008, Buckingham was in his apartment with two of his friends, Atencio and Atencio's brother Andrew. They drank beer and Tequila, smoked marijuana, and took Valium and Norco. Buckingham showed Atencio how to use the Glock.

Buckingham recalled that Atencio was still awake and at the apartment when Buckingham went to sleep between 3:00 and 5:00 a.m. on March 7. Buckingham could not recall whether the Glock was in the kitchen or under his pillow when he went to sleep.

5

Atencio's brother Andrew awoke and left the apartment at 7:00 a.m. on March 7, before the shooting occurred. Andrew recalled there was a gun on the coffee table that Atencio had handled.

Later on the morning of March 7, Buckingham awoke to defendant sitting on top of him, beating him up. Defendant hit Buckingham in the face 10 to 20 times. While defendant was beating Buckingham, Lewis was in the room with a gun and a third person was blocking the bedroom door, possibly holding a gun as well. Defendant and Lewis then dragged Buckingham off the bed to the floor, where defendant proceeded to kick him.

Lewis then demanded to know where Buckingham kept his "stash." Defendant said, "That's not what we're here to do. Do what we came here to do," and Lewis then crouched down and began choking Buckingham. Buckingham could not breathe, became dizzy, his vision became fuzzy, and he felt like he was going to die. He did not suffer any lasting injuries from the assault, however.

As Lewis was choking him, Buckingham heard a loud thud coming from the living room. Buckingham did not know anyone else was in the apartment. Lewis got off Buckingham, and Lewis, defendant, and the other man ran from the bedroom. Buckingham got up, but still had fuzzy vision. When he got to the bedroom door, he could see Lewis firing his handgun towards the front door.

Buckingham estimated that Lewis fired at least six to seven shots, but he heard a total of 10 to 15 shots. Once the shooting ended, defendant yelled, "We gotta go now,"

6

and defendant, Lewis, and the other man ran off. Buckingham then went through the living room and out the front door. Outside, he found Atencio on the ground, in a planter. Atencio was gasping for breath and bleeding from his chest. Buckingham called 911, but Atencio died before help could arrive. Buckingham did not see his Glock anywhere.

C. *Charles Carr's Testimony*

Charles Carr was arrested on March 8, 2008, and he and defendant were initially charged with the same crimes. Carr pled guilty to being an accessory to the crimes (§ 32), and was facing a sentence of up to four years in prison when he testified for the prosecution at defendant's trial.

Around two days before the March 7, 2008, shooting at Buckingham's apartment, Carr, Christopher Rivera, defendant, and Lewis were in the SUV, blocking Buckingham's car from leaving the apartment complex. Rivera was driving the SUV, which belonged to Rivera's mother, and defendant was in the front passenger seat. The foursome arrived at Buckingham's apartment complex in the SUV as Buckingham was leaving. Defendant got out of the SUV and ran to the driver's side of Buckingham's car. Rivera then backed the SUV behind Buckingham's car, blocking Buckingham in.

Carr saw a gun pointed out of the window of Buckingham's car, and defendant put his hands in the air and froze. Buckingham then backed into the SUV, sped off, and defendant jumped back into the SUV. Rivera was upset that the SUV was damaged, and

defendant was saying, we're "gonna . . . kick his ass." They followed Buckingham but lost him, and returned to defendant's home.

On the day of the shooting, Carr, Rivera, Lewis, defendant, and defendant's girlfriend were at defendant's house. Eventually, defendant, his girlfriend, and Lewis left the house in Lewis's car, and Rivera followed in Rivera's car. They dropped defendant's girlfriend off at a McDonald's before proceeding to Buckingham's apartment.

When Carr arrived at the front door of the apartment, defendant, Rivera, and Lewis were already inside. From the front door, Carr could hear fighting coming from the bedroom. Carr saw a young man on the couch, asked the man what was going on, and the man stood up with a gun in his hand. After the young man cocked the gun, Carr ran from the apartment. As he ran, Carr heard more than 10 gunshots. Carr ran around the building and jumped over a fence.

While running down the street, Carr doubled back and saw defendant and the other men getting into their cars. Rivera told Carr to get into Rivera's car. Carr asked, "What happened, man?," and Rivera said, "I don't even know what happened, I had to fire back" or "I had to shoot back." Rivera may have also said something like, "The kid wouldn't stop shooting, I had to shoot back." Rivera also said he did not aim his gun but simply pointed the gun around the corner.

Carr and Rivera drove to Carr's house. When they arrived, Rivera pulled out two guns and said: "I have to have someplace to put these." Carr offered a hiding spot at

8

Carr's house, and Rivera put the guns there. Rivera then received a text message that defendant had been arrested, and retrieved the guns from Carr's hiding place.

Carr and Rivera then drove to Rivera's mother's house where Rivera wiped the guns down with towels. Carr and Rivera then drove to the desert where Rivera hid the guns under a rock pile. Later on March 7, Rivera and Carr returned to Carr's house. That evening, the police came to Carr's house and arrested Rivera and Carr. Carr showed a detective where the guns were hidden in the desert.

D. *Ballistics and Other Prosecution Evidence*

Atencio suffered two gunshot wounds to his right chest and one to his left chest. The left chest wound was fatal. It took Atencio several minutes to die, and he could have walked 15 to 20 feet before collapsing.

The guns the police recovered from the rock formation were Buckingham's Glock and a Sig Sauer nine-millimeter. The Sig Sauer was registered to Rivera's father. Criminalist William Matty testified that three bullet casings recovered from the apartment were fired by the Glock, and two were fired by the Sig Sauer.

All of the bullet fragments removed from Atencio's body were consistent with the Sig Sauer. Other fragments were consistent with both guns, and some fragments were too damaged to identify. Criminalist Hazel Whitworth believed the Sig Sauer was fired from the doorway of the apartment towards the outside.

Defendant's girlfriend, Stephanie Barling, was interviewed by police, and a tape of the interview was played for the jury. Barling said that before they left defendant's house

9

on March 7, she overheard defendant tell Lewis, "Don't worry, they're strapped," meaning that Carr and Rivera had guns. She was concerned and told defendant, "don't go being stupid, please." Defendant told her not to worry.

E. *Defendant's UnMirandized Statement to Deputy Hardin*

At trial, the jury heard Deputy Hardin testify that he spoke with Buckingham shortly after the shooting on March 7, 2008, then went to defendant's house with several other deputies. Defendant's house was only two blocks away from Buckingham's apartment. When the deputies contacted defendant inside his house, it appeared that defendant had just gotten out of the shower. Deputy Hardin told defendant that he was a suspect in a shooting that had occurred a couple of blocks away. In response, defendant said he had been home all day and could not have been at the scene of the shooting. Deputy Hardin then took defendant outside to participate in an in-field lineup, and waited for other officers to bring Buckingham to the house. After he saw Buckingham arrive in the backseat of a patrol car, defendant told Deputy Hardin that he did not know who Buckingham was.

### III. ANALYSIS

Defendant claims his statement to Deputy Hardin that he had been home all day and could not have been present at the shooting was admitted in violation of his *Miranda* rights. We disagree. As we explain, defendant did not make the statement in response to a question or statement designed to elicit an incriminating response—even if defendant was in custody when he made the statement.

10

A.  *The Evidence Code Section 402 Hearing*

Before defendant's statement to Deputy Hardin that he had been home all day was admitted, Deputy Hardin and defendant testified in an Evidence Code section 402 hearing to the circumstances surrounding the statement.  Their testimony and the trial court's ruling that the statement was admissible are described below.

1.  Deputy Hardin's Testimony

Deputy Hardin explained that he identified defendant as a suspect in the shooting after Buckingham told him that "Troy" was at the scene of the shooting and that "Troy" lived on "I and Sultana."  Deputy Hardin was familiar with defendant, knew where he lived, and knew he was on parole.

Deputy Hardin arrived at defendant's house, along with approximately four other deputies.  The deputies set up a perimeter around the house. Deputy Hardin then went to the front door and was allowed inside by a woman, possibly defendant's girlfriend. Deputy Hardin entered the house with his gun drawn, followed by at least one other deputy who also had his gun drawn.

Deputy Hardin called out for defendant as he made his way down a hallway. Defendant came into the hallway from a back bedroom, holding his young daughter in his arms.  Upon seeing the child, Deputy Hardin lowered his weapon.  He asked defendant whether he could pat him down for weapons, and defendant agreed.  Defendant placed his daughter on the floor and approached the deputy with his hands up.  It appeared that defendant had just taken a shower.  Deputy Hardin holstered his weapon for the patdown,

11

but another deputy kept his gun trained on defendant until it was ascertained that defendant had no weapons.

Deputy Hardin was using a "normal" tone of voice with defendant when he spoke to him in the hallway. After the patdown, Deputy Hardin told defendant he was there because a shooting had just occurred several blocks away, and he had information that defendant may have been involved. He told defendant that a witness could identify him or rule him out as being involved, and defendant agreed to step outside for an in-field lineup. On the way outside, defendant made the statement he claims was admitted in violation of his *Miranda* rights—that he could not have been at the scene of the shooting because he had not left home all day. Three or four minutes passed between the time Deputy Hardin first encountered defendant in the hallway and the time defendant made the statement.

Defendant was not handcuffed when he made the statement, or immediately after he walked outside. Outside, Deputy Hardin stood next to defendant while they waited 20 to 30 minutes for Buckingham to arrive. Four men were in the in-field lineup, including defendant. Buckingham was brought by in a patrol car. When Buckingham saw defendant, he said, "That's him, that's him, that's the son of bitch that shot him."

Deputy Hardin then handcuffed defendant, placed him in the back of a patrol car, and told him he was being taken to the station for further investigation. On the way to the station, defendant said he did not know who "that guy" was, referring to Buckingham, but not by name. Deputy Hardin confirmed that, during the in-field lineup, defendant

12

was being detained and would not have been allowed to leave, but Deputy Hardin did not tell defendant he was being detained at that time.

2.  Defendant's Testimony

Defendant testified he had just finished changing his two-year-old daughter in the back room of his home when the police arrived.  He knew the police were there before he stepped out of the back room.  Deputy Hardin handcuffed him in the hallway after he patted him down for weapons.  Deputy Hardin did not make him put his hands on the wall when he patted him down.  After he was handcuffed, defendant told Deputy Hardin that he had not left his house all day.  He did not recall Deputy Hardin asking him any questions.

3.  The Trial Court's Ruling

Defense counsel argued that defendant was in custody in the hallway and that Deputy Hardin's statement that he was a suspect in the shooting constituted an "implied accusation," if not a direct accusation, and an interrogation.  The prosecutor argued that defendant did not make the statement in response to an interrogation, even if he was in custody when he made the statement.

The court found Deputy Hardin's testimony that he did not handcuff defendant inside the house more believable than defendant's testimony to the contrary.  The court also found that Deputy Hardin's statement that defendant was a suspect in the recent shooting was not "calculated to solicit a response" from defendant, and "the words themselves [did] not suggest a response."  The court said it was reasonable for Deputy

13

Hardin to explain why he was there, and defendant was not being interrogated when he told the deputy he had been home all day. The court further found that defendant was not in custody until after Buckingham identified him in the in-field lineup, and he was handcuffed and placed in Deputy Hardin's patrol car.

Accordingly, the court ruled that the prosecution could introduce evidence of: (1) defendant's statement to Deputy Hardin in the hallway that he had been home all day and could not have been present at the time of the shooting; and (2) defendant's subsequent statement that he did not know who Buckingham was.

B. *Analysis*

The *Miranda* rule holds that any statements a person makes, whether exculpatory or inculpatory, during a custodial interrogation without first being advised of his or her *Miranda* rights[4] are inadmissible to prove the defendant's guilt. (*Berkemer v. McCarty* (1984) 468 U.S. 420, 429; *Miranda, supra,* 384 U.S. at p. 444.) The rule is designed to protect the defendant's Fifth Amendment right against self-incrimination (*Berkemer v. McCarty, supra,* at p. 428), and is concerned with the danger that a person will be induced to make incriminating statements he or she would not make but for the inherently coercive nature of a police-dominated atmosphere (*Miranda, supra,* at pp. 444-445, 461; *United States v. Martin* (9th Cir. 1986) 781 F.2d 671, 673). Thus, *Miranda* warnings are

---

[4] "'Before being subjected to "custodial interrogation," a suspect "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney . . . ."' [Citations.]" (*People v. Leonard* (2007) 40 Cal.4th 1370, 1399-1400.)

14

not required unless there is a custodial interrogation. (*Rhode Island v. Innis* (1980) 446 U.S. 291, 301; *People v. Mickey* (1991) 54 Cal.3d 612, 648.)

In reviewing the trial court's ruling that defendant was not in custody and was not being interrogated when he told Deputy Hardin that he had been home all day, we accept the court's factual findings provided substantial evidence supports them. (*People v. Mayfield* (1997) 14 Cal.4th 668, 733.) However we independently determine, based on the undisputed facts and those properly found by the trial court, whether defendant's challenged statement was illegally obtained. (*Ibid*.)

Applying these principles, we conclude that defendant was not being interrogated when he told Deputy Hardin that he had been home all day and could not have been present at the time of the shooting. It is therefore unnecessary to determine whether defendant was in custody when he made the statement to Deputy Hardin.[5]

Interrogation refers to express questioning and any words or actions "on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island v. Innis, supra,* 446 U.S. at p. 301, fns. omitted; *People v. Mayfield, supra,* 14 Cal.4th at p. 732.)

Under the totality of the circumstances, Deputy Hardin's statement to defendant that he was a suspect in a shooting that had just occurred only blocks away from his home was not reasonably likely to elicit an incriminating response from defendant. After

---

[5] The test for whether an individual is in custody is an objective one: was there a formal arrest or restraint on the person's freedom of movement of the degree associated with a formal arrest. (*Thompson v. Keohane* (1995) 516 U.S. 99, 112; *People v. Ochoa* (1998) 19 Cal.4th 353, 401.)

15

the deputy told defendant he was a suspect, he told defendant there was a witness who could identify him or rule him out as being involved in the shooting, and asked defendant to step outside to participate in an in-field lineup. In this context, the deputy's statement that defendant was a suspect was necessary to inform defendant why the deputies were there and why they wanted him to come outside. It was not reasonably likely to elicit an incriminating response from defendant, or get defendant to admit or deny that he was involved in the shooting.

*Miranda* warnings are not required when, as here, a suspect, unprovoked by police officers, makes a voluntary and spontaneous statement. As *Miranda* stipulates: "Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." (*Miranda, supra*, 384 U.S. at p. 478.)

A reasonable person in defendant's position would have understood that he was under no compulsion to speak when told he was a suspect in the shooting. Defendant's statement to Deputy Hardin that he had been home all day and could not have been involved in the shooting was given voluntarily, and was not admitted in violation of defendant's *Miranda* rights. Defendant's *Miranda* rights were not in play when defendant made the statement, because defendant was not being interrogated.

The present case is roughly analogous to *Innis*, where the high court ruled that the defendant was not being interrogated when he told officers where a shotgun was located. The defendant made the statement in response to the comments the officers made, while riding in a patrol car with the defendant, that they hoped to find a missing shotgun that

16

had been used in a robbery before a handicapped child found it and hurt themselves. (*Rhode Island v. Innis, supra,* 446 U.S. at pp. 293-294, 302-303.) The officers' comments were not reasonably likely to elicit an incriminating response because nothing in the record suggested that the officers knew the defendant was "peculiarly susceptible to an appeal to his conscience concerning the safety of handicapped children." (*Id*. at p. 302.) Here too, there is no indication that Deputy Hardin knew or reasonably should have known that telling defendant he was a suspect in the shooting, in connection with telling him why the deputies were in his house and why they wanted him to come outside, would elicit an incriminating response from defendant.

In sum, Deputy Hardin was explaining to defendant why he was in his house and why he wanted him to come outside when he told defendant he was a suspect in the shooting. In these circumstances, the deputy's statement to defendant that he was a suspect was not an interrogation, and the admission of defendant's purportedly responsive statement that he had been home all day and therefore could not have been involved in the shooting did not violate defendant's *Miranda* rights.

17

## IV.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING _____
J.

We concur:

RICHLI _____
Acting P. J.

MILLER _____
J.

18